Signed and Filed: April 1, 2021



_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>MYRIAN Y. MCINTOSH,<br><br>        Debtor.<br>_____<br>MYRIAN Y. MCINTOSH,<br><br>        Plaintiff,<br>v.<br><br>THOMAS A. MOORE AND ROOSEVELT LAW CENTER PC,<br><br>        Defendants. | Bankruptcy Case No. 19-10573-DM<br><br>Chapter 13<br><br><br><br><br>Adversary Case No. 19-01033-DM<br><br><br>Date: March 11, 2021<br>Time: 9:00 AM<br>Trial via Zoom Webinar |

**MEMORANDUM DECISION FOLLOWING TRIAL**

**I. INTRODUCTION**

    On March 11, 2021 the court conducted a trial in this adversary proceeding on the seventh cause of action, a claim of legal malpractice, against defendants Thomas A. Moore and

-1-

Roosevelt Law Center PC (collectively "Moore").[1] Plaintiff Myrian Y. McIntosh ("McIntosh") appeared through counsel; defendant Moore appeared on his own behalf and on behalf of Roosevelt Law Center PC.

After oral argument on March 16, 2021, the court took the matter under advisement.

For the reasons explained below, the court concludes that Moore is not liable to McIntosh for legal malpractice or any other theory advanced by her. Accordingly, the court will enter judgment in favor of Moore, determining that McIntosh takes nothing by her complaint.

## II. FACTS[2]

In September, 2017, McIntosh was experiencing financial problems and sought a loan modification from her mortgage lender, Wells Fargo Home Mortgage ("Wells Fargo"). She needed help regarding the secured debt on her home in American Canyon, California (the "Property.")

Previously McIntosh had experience with loan modifications; this time she sought help via an online search that led her to Moore. Over the course of her dealings with Moore, McIntosh had minimal contacts with him personally. This may be a function of searching for and selecting a counsel who is hundreds of miles

---

[1] The complaint as filed on September 12, 2019 named several defendants in addition to Moore and asserted six other claims for relief against various of those defendants. During pretrial, the other defendants were dropped from this case, leaving only Moore to defend the seventh cause of action.

[2] The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052(a).

-2-

away and only deals with clients by telephone or video conference and also who conducts his law practice largely through non-lawyer staff. It is regrettable that the time has passed when lawyers met their clients in person and discussed their situation in great detail. Notwithstanding that new legal world, McIntosh chose to select her counsel that way and to cast her fate with Moore to attempt to modify her mortgage and later to restructure her affairs through bankruptcy.

She entered into an Engagement Agreement and related documentation (Exhibit 1). That agreement includes a lengthy explanation of Moore's mortgage loan modification program, including the borrower's (McIntosh) authorization to Moore and his staff, recitals of the borrower's Delinquency Responsibility, and numerous provisions dealing with the expectations of the parties, ongoing obligations, payment provisions, dispute resolution and limitation of damages terms, among others. Of note is the Basic Outline of the Program (Exhibit 1, Page 3 of 14). In that portion McIntosh confirmed that she was retaining Moore to prepare documentation and negotiate with mortgage lenders, etc. One recital is that "[Moore] will try to perform one or more of the following: A. reduction in interest rate; B. reduction in the term of a loan or principal balance; C. waiver of late charges; D. short sale. . . ."

A provision of Exhibit 1 required McIntosh to set aside $4,500 "in whole or milestone scheduled increments" to be held in one of Moore's sub-accounts with Bank of America, which

"account will be designated specially for future payment of [Moore's] legal service cost" when the case is resolved.

McIntosh's counsel attempted to characterize some of the payments made to Moore shortly after that as on account of the loan modification proposal, thus violating California law prohibiting persons such as Moore from receiving a fee for loan modification services before a modification is obtained. The record is clear, however, that no money was paid to Moore for the services contemplated in Exhibit 1.

Notwithstanding the reference to a "short sale" in the documents, McIntosh's testimony was unequivocable that at the time she engaged Moore she had no intention or desire to sell the Property, whether by short sale or otherwise.

The first attempted loan modification through Moore was unsuccessful. On November 28, 2017, by letter to Moore (Exhibit 5), Wells Fargo denied McIntosh's application for a loan modification and included a provision in the denial that it was able to approve her for a short sale[3]. The same letter goes on to state that:

> "A short sale allows you to sell the [Property] at a price less than the amount needed to pay the mortgage in full. What this means for you:
>
> - You may be able to sell your home for less than you owe on your mortgage.

---

[3] The second paragraph of the denial states:
"We're able to approve you for a short sale. We recognize that this may be a different outcome than the one you requested. Please contact us so that we can help you understand the possible benefit of a short sale."

-4-

- You may be able to avoid foreclosure.
- You may be released from your obligation to repay the mortgage balance.

Be sure to speak with your tax and legal advisor about the implications of a short sale."

The record is also clear that notwithstanding this written proposal, neither Moore nor his staff discussed with McIntosh the possibility of a short sale at the time of the denial. In fact, there is no evidence Moore even provided Exhibit 5 to McIntosh until much later. This lack of a discussion of the possibility of a short sale is consistent with McIntosh's repeated desire to keep the Property. While it might have been preferrable that Moore had taken the time to discuss with her the pros and cons of short sales, or regular sales for that matter, the fact that he did not do so does not constitute legal malpractice regardless of what one may think of the professionalism, or lack thereof, that his conduct and inattention suggests.

Consistent with McIntosh's desire to retain the Property, she entered into a Law Firm Homeowner Agreement (Exhibit 2) dated December 21, 2017. Similar to the Engagement Agreement entered into September, Exhibit 2 is lengthy and includes similar provisions dealing with delinquency responsibility, the requirement for a retainer fee to be paid, the scope of legal services to be rendered and numerous inclusions and exclusions of what Moore and his law firm would be doing (or not doing) on account of the anticipated McIntosh bankruptcy. Of note are two provisions in that agreement. First, in para. 3, the agreement is called "Bankruptcy Retainer Agreement." Then in sub-

-5-

paragraph K, specifically excluded unless the subject of a separate written request or Retainer Agreement, is a "motion to impose or extend the bankruptcy stay."

Then, in para. 16, Arbitration of Disputes, the parties agreed that any claim or dispute, including professional negligence and malpractice, shall be resolved through binding arbitration[4].

In anticipation her filing Chapter 13, McIntosh made three payments to Moore as follows: $3,550 on December 6, 2017; $500 on December 12, 2017; $900 on January 2, 2018. Those payments are consistent with and precisely as contemplated on page 4 of Exhibit 2. With Moore's assistance, McIntosh filed her first bankruptcy case on January 17, 2018 (Case No. 18-10023-DM-13) ("First Case").

The court confirmed McIntosh's chapter 13 plan in the First Case on September 18, 2018 (Dkt. No. 33). Consistent with the court's normal practice, on September 18, 2018 (Dkt. No. 33) the court issued its Order Confirming Chapter 13 Plan. In that order it approved and allowed Moore attorney's fees in the sum of $4,610. That order was not objected to nor appealed and it is now final. Regardless of McIntosh's frustration and complaints about Moore, particularly in connection with the Second Case, there has been no challenge to the services rendered by Moore in the First Case nor any attempt to recover any of the fees paid on an account of those services.

---

[4] Moore did not raise either of these provisions in defending this adversary proceeding so they are both waived.

-6-

Only two months after confirmation, McIntosh failed to file the required documents stating that she had made post-petition payments to Wells Fargo. The court dismissed the First Case on December 18, 2018. It is hard to imagine why Moore did not discuss with McIntosh her options, including filing a post-confirmation motion to defer the prior payment defaults. Again, regardless of what one may think of what Moore, a bankruptcy specialist, might or should have done, there is no expert testimony that he committed legal malpractice or that McIntosh suffered compensable damages as a result.

Although Moore continued in active negotiation with Wells Fargo to obtain a modification of McIntosh's loan, McIntosh signed Exhibit 3 on December 21, 2017. It appears to be identical to Exhibit 2 other than the date and the amounts she paid Moore for the Second Case. Those later payments were as follows: $2,350 on January 11, 2019; $550 on January 28, 2019; $800 on February 8, 2019. McIntosh filed her second bankruptcy case (Case No. 19-10119-DM-13) ("Second Case") on February 25, 2019.

Because the First Case had been dismissed within the year of the filing of the Second Case, Bankruptcy Code section 362(c)(3) came into play.[5] Pursuant to that section, the automatic stay that protected McIntosh in the Second Case would only last thirty days unless extended. Thus, there was no

---

[5] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

-7-

automatic stay in effect in the Second Case after March 26, 2019.

The thrust of this lawsuit, at least from the outset, is that somehow Moore committed legal malpractice by not attempting to extend the automatic stay. This is McIntosh's principal theory of Moore's culpability notwithstanding the inescapable fact that McIntosh's personal and financial situation offered no assurances that such an attempt would have been successful[6]. The same is true of the conduct complained of in paragraph 92 of the seventh cause of action ("upon advice of [Moore]" McIntosh dismissed the First Case or paragraphs 93-94, regarding the court's Mortgage Modification Mediation Program ("MMMP") or the McIntosh might have considered a motion to incur debt (presumably to deal with her car payment defaults).

On February 26, 2019, Wells Fargo (though its servicer, Selene Finance, LP ("Selene"), again denied McIntosh's loan modification request (Exhibit 6). Again, she was told that she was eligible for a short sale although this time the denial did not include the extensive documentation for such a short sale that was included in Exhibit 5. Selene identified two loss mitigation programs for which McIntosh had been evaluated. Before setting forth the options of "short sale" or "deed-in-lieu", for both of which she was "Eligible", Selene stated: "Estimated Value: $675,000.00" of the Property.

Selene did not provide a basis for its statement as to the value of the Property, nor authenticate such a value in any way.

---

[6] Moore did not invoke the provisions of para. 3K of Exhibit 2 on this issue.

-8-

At trial, McIntosh did not express any opinion as to the value of the Property as of the date of the modification denial or the later foreclosure date.

Remarkably Moore and his legal assistant primarily assigned to McIntosh's case did not advise her of the second denial and instead led her to believe that negotiations were continuing.

Only three months later, the chapter 13 trustee filed a motion to dismiss the Second Case because of plan payment defaults and other reasons. The court dismissed the Second Case prior to confirmation on May 23, 2019. As a consequence of the dismissal, any extension of the automatic stay during the Second Case would have expired. In retrospect the fact that Moore did not seek to extend the automatic stay in the Second Case is of no moment because such an extension, if granted, would only have lasted approximately two months and there is no evidence in the record to suggest that Selene, Wells Fargo or anyone else performed any act that would have violated the stay during that period if there had been a stay in effect.

Since McIntosh's chapter 13 plan was not confirmed in the Second Case, there was no corresponding order approving his attorney's fees. Thus the $3,700 paid to him in January and February 2019 had never been revisited. The court takes no position on whether McIntosh could have, or now may, seek to recover any or all of those fees on any theory other than legal malpractice.

About two weeks later, McIntosh paid $1,500 to Moore to prepare a third bankruptcy case on her behalf. Nothing further came of that arrangement and she had no further dealings with

-9-

Moore. She filed chapter 13 a third time ("Third Case") on August 2, 2019, this time through present counsel who continues to represent her in the Third Case and represented her at trial in this adversary proceeding.

On the same day, Wells Fargo foreclosed on the Property. Following foreclosure, it returned to McIntosh surplus funds in an amount unclear to the court but between just over $20,000 and just over $50,000.

**III. DISCUSSION**

In their trial briefs both sides set forth familiar legal principles to apply. The decision in this case depends on the facts proven at trial. If there is a subsequent review of this decision, those facts will be assessed under the clearly erroneous rule, and the legal conclusions examined *de novo*. There is no point in repeating them here.

In the single claim against Moore, McIntosh alleges that "upon advice of [Moore]" she lost her automatic stay protection in order to purchase a car (¶ 92). She also alleges that Moore had an obligation to inform her of her right to participate in the court's mediation program (¶ 93), that a motion to incur debt "would have ensured that the bankruptcy stay remain in place protecting [McIntosh's] property" (¶ 94). And that upon the filing of the Second Case, Moore failed to seek to extend the stay (¶¶ 95-100).

Days before trial, counsel for McIntosh sought to amend the complaint, apparently as a result of new claims based upon late disclosure of the two loan modification denials (Exhibits 5 and

-10-

6) and the "discovery" that Moore's legal assistant had secured an oral stay of foreclosure from Wells Fargo and in denying such a loan modification, had offered a short sale as an option[7]. For the same reason, she again faulted Moore for discounting the need for McIntosh attempting to invoke the MMMP. These and other revelations led counsel to argue that McIntosh had improperly paid Moore in December 2017 for improper modification payments (proven to be incorrect by the uncontroverted evidence) and that based upon such conduct there were various violations of California's unfair competition law and conduct amounting to fraud, intentional misrepresentation, unjust enrichment and breach of contract. In making that last minute request over Moore's vehement opposition, McIntosh's counsel proposed moving forward on schedule and said she would "seek to have her claims amended to conform with the proof", offering Moore an opportunity for more time so that he could build his defense. Moore resisted that request and insisted that the matter go to trial.

The best that can be said of this 11th hour strategy is that it was hopeless. First, Exhibits 5 and 6 were made available to counsel weeks before trial. Second, McIntosh's expert had expressed no opinions about the theories being advanced. Third, allowing trial counsel to present new theories of liability only days before trial is inherently unfair to the defense. Finally, counsel's novel theory that she was entitled to some sort of a post-trial prove-up hearing to establish

---

[7] Note the irony that a voluntary stay of foreclosure is just as good as an extension of the automatic stay of foreclosure.

-11-

damages suffered by McIntosh is not recognized by the court nor apparently even by counsel, who cited no authority for that proposition.

The argument is somewhat moot in any event because at trial, McIntosh did not offer any persuasive and admissible evidence that Moore had violated California law or engaged in any intentional fraud or misrepresentation. Accordingly, the court finds no proof of any fact established at trial that could support a conforming amendment of the pleadings.

The parties submitted competing expert reports. McIntosh relied on the written opinion of her expert, Helen Ryan Frazer, a member of the California bar since 1980 who has served as a chapter 7 trustee in the Central District of California since 1995 and who has been certified as a legal specialist in the area of bankruptcy. In disclosing her expertise, Ms. Frazer identified her assignment in a summary of her opinions:

> 7. I have been engaged by the Plaintiff, Ms. Mcintosh to provide my expert testimony in her adversary proceeding regarding my opinion as to whether the Defendants' professional behavior towards Ms. Mcintosh met the required standard of care of (sic) licensed California attorney when dealing with any chapter 13 client, but especially where that chapter 13 client has one case dismissal within the 6 months of filing a second case.

*See* Exhibit 1, Plaintiff's Expert Report by Helen R. Frazer, Esq. (Dkt. No. 76, ECF Page 10 of 11).

Ms. Frazer sets forth fairly recognizable statements as to the standard of care pertaining to an attorney as a fiduciary, causes of action for breach of fiduciary duty, and obligations

-12-

of California Rule of Professional Conduct 3-110. She finds fault with Moore "to have simply allowed the [First Case] to be dismissed at all." There is no evidence that would support a finding that Moore caused that case to be dismissed as the record is clear why it was dismissed. Further, McIntosh conceded that even if she had known that she needed to file declarations of post-confirmation payments, she would not have been able to do so because she was delinquent in her payments.

In connection with the Second Case, Ms. Frazer correctly identified the provisions of sub-para 3K of Exhibit 2, carving out a duty to seek to extend the stay. She opines that the services to be rendered "must necessarily include a motion to extend the automatic stay," without explaining the inconsistency. She makes no casual connection between the ultimate foreclosure of the Property in August, nearly three months after the Second Case was dismissed. The most glaring deficiency of Ms. Frazer's opinion, however, is that she does not quantify in any amount whatever damages flowed from Moore's professional failures she has identified. Absent any measurable damages, Ms. Frazer's general criticism of Moore's a failure to "provide knowledgeable and informed representation" does not support a finding that that conduct led to the loss of the Property or makes Moore liable for legal malpractice.

Moore identified as his expert, John H. Bauer. Mr. Bauer also identified his assignment, namely to render an expert opinion on Moore's potential liability for legal malpractice in connection with the First Case and the Second Case and whether his conduct was the proximate cause of foreclosure of the

Property on August 2, 2019.  He set forth his qualifications in a professional curriculum vitae (which the court accepts) and persuasively opines that there was no breach of duty of care towards McIntosh by Moore as alleged in paragraphs 92 through 100 of the complaint.  He concludes, as does the court, that the underlying problem in this case was McIntosh's "personal economics and inability to perform the chapter 13 plan" , not conduct of Moore in either bankruptcy case.

    He further opines, and the court concludes:

> "My review of the file shows no evidence which would lead me to reasonably believe that any failure on Moore's part in either bankruptcy was the proximate cause of Plaintiff's later, ultimate foreclosure."

See Expert Report, Dkt. No. 75-1, ECF Page 17 of 64.

    Mr. Bauer concludes his expert opinion by commenting on McIntosh's complaint and his own views about what might have happened after Moore was discharged.  Those observations are beyond his assignment and have not been considered by the court in reaching its decision.  What might have happened and what did happen in preparation of the Third Case is irrelevant to the issues presented to the court.

**IV. CONCLUSION**

    The court regrets McIntosh's loss of the Property and all of the financial difficulties she has experienced.  The court rejects, however, the theory of her case that she can blame her prior counsel under myriad theories and criticisms, all bundled up into a very serious charge of legal malpractice.  For the reasons stated above, the court concludes that Moore is not

culpable under the seventh cause of action as set forth in the complaint or under any of the other last-minute theories cobbled together at the beginning of trial.

There may have been other strategies or options that might have been attempted. The actual theory of the complaint as pled and the proof that followed, does not give rise to professional liability or legal malpractice by Moore or Roosevelt Law Center PC. Regardless of any second guessing or criticisms that may have been expressed by McIntosh's current counsel or even the observations of the court questioning less-than-professional conduct by Moore at times, Moore is entitled to judgment, which is being issued concurrently with this Memorandum Decision.

**END OF MEMORANDUM DECISION**

COURT SERVICE LIST

ECF Recipients